IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

TAMIKA L. CASTER,                        *
                                         *
     Plaintiff,                          *
                                         *
vs.                                      *    Civil Action No. 12-00595-B
                                         *
CAROLYN W. COLVIN,[1]                    *
Commissioner of Social Security,*
                                         *
     Defendant.                          *


## ORDER

Plaintiff Tamika L. Caster (hereinafter "Plaintiff") brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for a period of disability, disability insurance benefits, and supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401, *et seq.*, and 1381, *et seq.*  On September 8, 2013, the parties consented to have the undersigned conduct any and all proceedings in this case. (Doc. 18).  Thus, the action was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (Doc.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d), Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

21). Upon careful consideration of the administrative record and the memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner be **AFFIRMED**.

## I.  Procedural History

Plaintiff protectively filed an application for a period of disability, disability insurance benefits, and supplemental security income on November 3, 2008. (Tr. 140-45). Plaintiff alleges that she has been disabled since October 21, 2008, due to her back pain. (Id. at 56, 140, 142). Plaintiff's applications were denied and upon timely request, she was granted an administrative hearing before Administrative Law Judge Linda Helm (hereinafter "ALJ") on June 10, 2010. (Id. at 49). Plaintiff, her attorney, Jonathan Gardberg, and a Vocational Expert (hereinafter "VE") attended the hearing and offered testimony. (Id. at 47-77). On July 29, 2010, the ALJ issued an unfavorable decision finding that Plaintiff is not disabled. (Id. at 28-42). The Appeals Council denied plaintiff's request for review on July 27, 2012. (Id. at 1-3). The parties waived oral argument (Docs. 19, 20), and agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

**II.   Issue on Appeal**

    **A.   Whether the ALJ erred in failing to develop the record by not ordering an orthopedic consultative examination?**

**III. Factual Background**

Plaintiff was born on May 23, 1973, and was 37 years of age at the time of her administrative hearing on June 10, 2010. (Tr. 122, 54).  Plaintiff testified at the hearing that she graduated from high school and last worked in 2008 as a certified nursing assistant for the mental health ward at Searcy Hospital. (Id. at 56, 161).  According to Plaintiff, she can no longer work because she has "excruciating back pain [that]…feels like [her] bones are rubbing together." (Id. at 58).  Plaintiff testified that her pain inhibits her ability to "stay in one position for too long" and "there's no comfortable position that [she] can get in for a long period of time…" (Id. at 58-59).  She testified that she underwent back surgery that "helped for a short while, and [she] thought [she] was going to be able to go back to work, but the pain came back." (Id. at 59).  Thus, she decided to resign from her job because "the pain is not letting up." (Id.).

Plaintiff testified that she takes Flexeril[2], Vicodin[3], and "Etspolac"[4], which help with her ailments. (Id.). According to Plaintiff, Flexeril causes her to sleep for two or three days; thus, she only takes it when her pain is "excruciating pain". (Id. at 60). She takes her other two medications on a regular basis and they help with her pain.(Id.).

Plaintiff testified that she also experiences knee problems, which affect her right knee more than the left, and that her mediations help with her knee pain as well. (Id. at 60-61). Plaintiff also testified that she declined cortisol injections in her knee because she felt that the injections would only "cover up" her pain as oppose to helping to cure her ailment. (Id.).

With regards to her daily activities, Plaintiff testified or indicated on her function report that she drives her children

---

[2] Flexeril® is a muscle relaxant that is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries. See http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a682514.html. (Last visited: March 12, 2014).

[3] Vicodin® tablets are indicated for the relief of moderate to moderately severe pain. See http://dailymed.nlm.nih.gov/dailymed/archives/ fdaDrugInfo.cfm?archiveid=3926. (Last Visited: March 12, 2014).

[4] After exhaustive research, the Court was unable to find a drug named "Etspolac", which Plaintiff testified is an anti-inflammatory prescription drug that she takes to alleviate the burning sensation in her back. (Tr. 59). Research suggests that "Etspolac" may be a misspelling for the drug Etodolac, which is an anti-inflammatory medication. See http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a692015.html. (Last visited: March 12, 2014). Etodolac is in a class of medications called nonsteroidal anti-inflammatory drugs that work by stopping the body's production of a substance that causes pain, fever, and inflammation. (Id.).

to school, shops at the grocery store "every other day", does light housework, such as vacuuming, washing dishes and sweeping the floor, watches television, sits outside, and prepares "simple" meals for her family. (Id. at 63-64, 167, 169, 170). Plaintiff also testified that she attends social events, sporting events, and church services. (Id. at 64).

## IV.  Analysis

### A.  Standard of Review

In reviewing claims brought under the Act, this Court's role is a limited one.  The Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied.[5] Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).  A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding substantial evidence is defined as "more than a scintilla, but less than a

---

[5] This Court's review of the Commissioner's application of legal principles is plenary. Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable, as well as unfavorable, to the Commissioner's decision. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999 U.S. Dist. LEXIS 10163, *4 (S.D. Ala. June 14, 1999).

B.    **Discussion**

An individual who applies for Social Security disability benefits must prove his or her disability. 20 C.F.R. §§ 404.1512, 416.912. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); see also 20 C.F.R. §§ 404.1505(a), 416.905(a). The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven his disability.[6] 20 C.F.R. §§ 404.1520,

---

[6] The claimant must first prove that he or she has not engaged in substantial gainful activity. The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found

416.920.

In the case *sub judice*, the ALJ determined that Plaintiff has not engaged in substantial gainful activity throughout the period under consideration and that she has the severe impairments of degenerative disc disease of the lumbar spine, effusion of the knees bilaterally, and history of papilledema with associated cephalgia - pseudotumor cerebri. (Tr. 33). The ALJ further found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments contained in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id. at 34).

The ALJ concluded that Plaintiff retains the residual functional capacity (hereinafter "RFC") to perform less than the full range of light work. (Id. at 35). The ALJ concluded that Plaintiff needs the ability to alternate between sitting and

---

disabled regardless of age, education, or work experience. If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove an inability to perform their past relevant work. Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history. Id. Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history. Sryock v. Heckler, 764 F.2d 834, 836 (11th Cir. 1985). If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled. Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999). See also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

standing, but does not need to leave the workstation. (Id.). She is limited to no more than occasional climbing stairs and ramps, bending and balancing, and no more than rarely stooping, kneeling, crouching, and crawling. (Id.). She is completely restricted from operating foot controls, climbing ladders, scaffolds or ropes, and working around unprotected heights or dangerous equipment. (Id.). The ALJ further concluded that Plaintiff is limited to jobs with simple, one to two step instructions and should avoid jobs with complex and detailed instructions. (Id.).

The ALJ also determined that Plaintiff's statements concerning her impairments and their impact on her ability to work are "considerably more limited and restricted than is established by the objective evidence of record." (Id. at 37). While the ALJ concluded that Plaintiff's RFC precludes her from performing her past work as a certified nursing assistant, a housekeeper, and a telemarketer (id. at 40), the ALJ utilized a VE and determined that based on Plaintiff's age, education, work experience, and RFC, she can perform the representative occupations of a mail clerk/non-postal, parking lot attendant, and ticket taker/ticket seller. (Id. at 41). Thus, the ALJ concluded that Plaintiff is not disabled. (Id.).

## 1. **Medical Evidence**[7]

The medical records reflect that Plaintiff sought treatment at Saraland Chiropractic starting in July of 2006. (Id. at 222-27). From July 12, 2006 through August 7, 2006, Plaintiff sought chiropractic care on eight occasions throughout the one-month time period. (Id. at 226). Treatment notes reflect that Plaintiff complained of low back pain that was consistently improving and became "better" with each visit. (Id.).

More than a year later, Plaintiff returned to Saraland Chiropractic on March 26, 2008, and reported that her lower back had been hurting for three months and that her left leg had recently began hurting as well. (Id. at 222, 226). X-rays revealed lumbar spinal complications. (Id. at 223). Over the course of a three week period, Plaintiff received frequent chiropractic treatments. (Id. at 226-27). Treatment notes reflect that although Plaintiff was "getting better", her low back pain was "persistent". (Id. at 227).

On October 7, 2008, Plaintiff sought treatment for her back pain from Dr. Fontana, an orthopedic surgeon at the Alabama Orthopaedic Clinic. (Id. at 233). Dr. Fontana's treatment notes reflect that Plaintiff reported "lower back pain and pain radiating down [her] legs and buttocks" for six months. (Id.).

---

[7] While the undersigned has considered all the evidence of record, only those records bearing on Plaintiff's impairments during the relevant time period are discussed herein.

Dr. Fontana's physical examination revealed lower back spasm, slightly decreased sensory in her foot, and decreased reflexes in her Achilles. (Id.).  Upon testing, Plaintiff's range of motion was measured at forward flexion 30, extension 20, and left and right lateral flexion 20. (Id.).  X-rays of her lumbar spine, anteroposterior, lateral, and obliques, revealed mild degenerative disc disease. (Id.).  Dr. Fontana's impression was lumbar radiculopathy, which he treated with Medrol[8].  He also recommended an MRI. (Id.).

On October 21, 2008, Plaintiff's alleged onset date of disability, she had an MRI of her lumbar spine.  The MRI revealed posterior and left paracentral disc herniation with left lateral recess, proximal left foraminal, and central canal stenosis at L5-S1. (Id. at 229).  It also revealed midline annular tear and posterior protrusion at L4-L5 with minimal foraminal encroachment and concentric central canal narrowing. (Id. at 230).  During a follow-up visit with Dr. Fontana on October 24, 2008, physical exam of Plaintiff revealed restricted range of motion and continuous pain. (Id.).  After discussing treatment options, Dr. Fontana scheduled Plaintiff an epidural

_____

[8] Medrol® is the brand name for Methylprednisolone, a corticosteroid, which is similar to a natural hormone produced by the adrenal glands. See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682795.html. (Last visited: March 13, 2014).  It is often used to replace this chemical when your body does not make enough of it. (Id.).  It relieves inflammation, swelling, heat, redness, and pain. (Id.).

steroid injection and prescribed Tylox[9]. (Id. at 232).

On November 7, 2008, Plaintiff returned to Dr. Fontana and reported that she continued to experience pain that radiated down her leg. (Id. at 231). Upon physical exam, Plaintiff exhibited restricted range of motion. (Id.). Dr. Fontana gave Plaintiff a temporary "work excuse" and prescribed Lortab for her pain. (Id.).

Plaintiff began seeing Dr. James West, M.D., an orthopedic surgeon, for her back pain on November 26, 2008. (Id. at 238). Plaintiff reported to Dr. West that she had pain in her lower back and left buttocks that had been ongoing for two months. (Id.). She rated her pain a five out of ten on the pain scale. (Id.). Her physical examination by Dr. West revealed lumbar spasm, tenderness and pain on forward flexion, and decreased left S1 reflex; however, she was able to accomplish a positive strait leg raise on her left leg. (Id.). X-rays revealed mild degenerative disc disease and an MRI revealed a herniated disc at left 4-5. (Id.). Dr. West prescribed Mobic[10], Darvocet[11], and

---

[9] Tylox® (oxycodone and acetaminophen capsules) is narcotic medication that is indicated for the relief of moderate to moderately severe pain. See http://dailymed.nlm.nih.gov/dailymed/lookup.cfm?setid=bdf359c2-a984-4e2b-90f7-f2f95613afca. (Last visited: March 13, 2014).

[10] Mobic® is an anti-inflammatory drug. See http://dailymed.nlm.nih.gov/archives/fdaDrugInfo.cfm?archiveid=14800. (Last visited: March 13, 2014).

[11] Darvocet® is a brand name for Propoxyphene, which is a medicine used to relieve pain. See http://www.nlm.nih.gov/medlineplus/ency/article/002537.htm. (Last visited: March 13, 2014).

Soma [12] and recommended a 4-5 epidural steroid injection and physical therapy. (Id.). Dr. West restricted Plaintiff from work from November 17, 2008 until she was rechecked on Dec. 17, 2008. (Id.).

The treatment notes reflect that Plaintiff underwent physical therapy from December 3, 2008 to December 22, 2008. (Id. at 248-54). The treatment notes reflect that Plaintiff had nine physical therapy sessions over that time period and that that her progress was "fair"; her posture was improved; she was independent with her HEP; and she appeared to have "maximally benefited" from the therapy. (Id. at 251, 253). Plaintiff reported that she felt a "little better", and she credited her success to her medications and the epidural as opposed to the therapy. (Id. at 253).

During Plaintiff's follow-up visit with Dr. West on December 22, 2008, she reported that she had been experiencing difficulty with her daily routine and that her symptoms continued. (Id. at 237). She also reported moderate pain. Dr. West performed another steroid epidural injection. (Id.). A week later, Plaintiff's medications were refilled. (Id.).

Dr. West's treatment notes reflect that on January 5, 2009,

---

[12] Soma® is the brand name for Carisoprodol, a muscle relaxant, which is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries. See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682578.html. (Last visited: March 13, 2014).

Plaintiff reported that her epidural treatment caused her to become worse than she was before the treatment. (Id. at 236). During Plaintiff's office visit the next day, Dr. West advised her that because the epidural failed, surgery was her only other option. (Id. at 237). Dr. West also gave Plaintiff a "note to hold her out of work for a further period of time" and prescribed her additional medications. (Id.). When Plaintiff returned to Dr. West the next week, she confirmed that she wanted to proceed with the surgery. (Id. at 236).

Plaintiff underwent L5-S1 microdiscectomy surgery on January 20, 2009. (Id. at 240). The treatment notes reflect that Plaintiff tolerated the procedure well and returned to the recovery room in satisfactory condition. (Id.).

When Plaintiff returned for her three-week postoperative appointment on February 9, 2009, Dr. West noted that Plaintiff was "doing well"; she had "decreased symptoms"; and she was "tolerating her daily routine". (Id. at 235). Additionally, Dr. West noted that her wound was benign. (Id.). Dr. West cleared Plaintiff to drive and instructed her to "slowly increase her activity and increase her walking program." (Id.). Dr. West restricted Plaintiff from all heavy lifting, bending, and twisting and noted that she was "unable to work" at the time. (Id.).

At Plaintiff's six-week postoperative appointment on March

13

2, 2009, Dr. West found that Plaintiff was "doing well" and exhibited a decrease in symptoms. (Id.). Dr. West noted "[m]arked improvement of her radicular symptoms" with "some residual anticipated lumbar complaints." (Id.). He referred her to physical therapy and told her to "hold her out of work for [two] weeks". He also noted that when she returned for her follow up in two weeks, she would likely be ready to "return to work." (Id.).

Plaintiff underwent physical therapy from March 5, 2009 through March 16, 2009. (Id. at 243-46). The treatment notes reflect that Plaintiff was "doing better"; she was "good over the" weekend"; and that she reported that "since the surgery her left [leg] radicular have resolved". (Id. at 245-46). However, Plaintiff also reported that she "continue[d] to have left sided lumbar pain with long periods of standing." (Id. at 246).

On March 26, 2009, Plaintiff returned to Dr. West for her nine-week postoperative appointment. (Id. at 241). Dr. West found that Plaintiff was "doing reasonably well regarding her lumbar spine." (Id.). He also found that she had less spasm, less pain, and better range of motion. (Id.). Plaintiff reported pain in both knees. (Id.). Upon examination, Dr. West found that Plaintiff had effusion in only the left knee with "some decreased range of motion." (Id.). Dr. West "offered to inject her [left] knee [with] corticosteroid". (Id.). However,

Plaintiff opted to "hold off" on the knee treatment. (Id.).
Thus, Dr. West advised her to consider the injections if her
left knee did not improve. (Id.). After a complete assessment,
Dr. West found that Plaintiff could "return to work at
light/medium duty" with no heavy lifting, bending, or twisting.
(Id.).

On May 4, 2009, Dr. Francis Sullivan, M.D., a state agency
physician, reviewed Plaintiff's medical records and diagnosed
Plaintiff with mild degenerative disc disease with a secondary
diagnosis of lumbar radiculopathy. (Id. at 255-62). Dr.
Sullivan opined that Plaintiff could perform the exertional
demands of a range of light work that does not require climbing
ropes, ladders, or scaffolds. (Id. at 257). He further opined
that she could do no more than occasional climbing of ramps and
stairs, stooping, and crouching. (Id.). He also opined that she
should avoid exposure to hazards. (Id. at 259).

On June 26, 2009, Plaintiff sought treatment from Franklin
Primary Health Center ("Franklin") for back pain. (Id. at 278).
Plaintiff reported her pain as a ten out of ten on the pain
scale. (Id.). Her physical examination was largely normal,
except tenderness over her L-5 spine, bilateral knee crepitus,
and pain over her knees and elbows. (Id. at 278-79). Plaintiff
was diagnosed with arthritis, back pain, and bilateral elbow and
knee pain. (Id. at 279). Plaintiff was prescribed medications.

(Id.).

About a month later, on July 24, 2009, Plaintiff returned to Franklin and reported chronic low back pain. (Id. at 276). At this visit, Plaintiff also requested "a letter for food stamps" that specified that she had a "disability" and was "unable to work." (Id.). A physical examination revealed that Plaintiff was "nontender to her L-5 spine", she had bilateral knee crepitus, and her blood pressure was elevated. (Id.). Plaintiff was diagnosed with low back pain, hyperlipidemia, and hypertension. (Id.). The physician decreased her Lortab medication for pain and increased her Mobic prescription. (Id.). She was instructed to return in one month. (Id.).

Plaintiff returned to Franklin on September 21, 2009, and reported persistent low back pain and numbness in her buttocks that radiated to her left thigh. (Id. at 272-274). Plaintiff also reported that her pain was an eight out of ten on the pain scale. (Id.). The treatment notes reflect that Plaintiff appeared "comfortable" and she had a positive bilateral strait leg test. (Id.). Plaintiff was diagnosed with status post-laminectomy, hyperlipidemia, and hypertension. (Id. at 273). Plaintiff was initially prescribed Lortab and Mobic; however, she was counseled on potential dependency to Lortab and advised that her Lortab would be withheld until Franklin received a note from Dr. West. (Id.). After counseling, Plaintiff agreed to

discontinue Lortab. (Id.). The record reflects that Plaintiff did return to Franklin for any additional treatments after this visit.

Over four months later, on January 27, 2010, Plaintiff presented to Mobile Infirmary Medical Center with complaints of back pain for about four days. (Id. at 265). Plaintiff reported her pain as a ten out of ten on the pain scale. (Id.). The treatment notes reflect that Plaintiff was in "no acute distress". (Id.). A physical assessment revealed that Plaintiff had lower lumbar paraspinal spasm and tenderness. (Id.). Plaintiff's range of motion in her back and her extremities were "within normal limits". (Id.). X-rays of Plaintiff's back showed no abnormalities. (Id. at 270-71). Plaintiff was diagnosed with acute back pain and low back strain of the lumbar area. (Id. at 269). Plaintiff was prescribed Vicodin, Lodine, and Flexeril and instructed to refrain from strenuous activity, lifting more than five pounds, bending, stooping, and prolonged sitting until she was well. (Id.). She was also instructed to rest at home and stay home from work for the remainder of the day and the next day. (Id.).

Five months later, on June 7, 2010, Plaintiff presented to the University of South Alabama Children's and Women's Hospital with complaints of right side and back pain. (Id. at 295). Plaintiff also complained of nausea and stated that she had been

"belching frequently." (Id. at 291). The treatment notes reflect that upon admission, Plaintiff was alert, oriented, and active and that she had began taking Lortab again. (Id. at 291, 295). Plaintiff's final diagnosis was gallstones (cholelithiasis). (Id.). She was treated, discharged in stable condition, and instructed to follow up with the Franklin Clinic. (Id.). There are no records indicating that Plaintiff sought any follow-up treatment from the Franklin Clinic.

## 2. Issue

### A. Whether the ALJ erred in failing to develop the record by not ordering an orthopedic consultative examination?

In her brief, Plaintiff argues that the ALJ erred in denying her request for a consultative examination with a board certified orthopedic surgeon. (Doc. 13 at 2). Specifically, Plaintiff argues that the ALJ's statement that "[t]here is no indication of a change in the [Plaintiff's] condition, the current severity of which is not established" (tr. 40) required the ALJ to obtain a consultative examination in order to establish the severity of Plaintiff's condition. (Doc. 13 at 2). After careful review of the record, the Court finds that the ALJ's decision is supported by substantial evidence, that the record contains sufficient evidence upon which the ALJ was able to decide this case, and that the decision to forgo a

consultative physical examination was not error under the circumstances of this case.

It is well established that a hearing before an ALJ in social security cases is inquisitorial and not adversarial. A claimant bears the burden of proving disability and of producing evidence in support of his claim, while the ALJ has "a basic duty to develop a full and fair record." Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003) (per curiam); see also Ingram v. Commissioner of Soc. Sec. Admin., 496 F.3d 1253, 1269 (11th Cir. 2007). This duty to develop the record exists whether or not the claimant is represented by counsel. Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995).

The responsibility for determining a plaintiff's RFC lies with the ALJ and is based on all of the evidence of record. See Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th Cir. 2004) (ALJ has duty to assess the residual functional capacity on the basis of all the relevant credible evidence of record); 20 C.F.R. §§ 404.1546, 416.946 (responsibility for determining a claimant's residual functional capacity lies with the ALJ). See also Foxx v. Astrue, 2009 U.S. Dist. LEXIS 80307, *17, 2009 WL 2899048, *6 (S.D. Ala. Sept. 3, 2009) ("The RFC assessment must be based on all of the relevant evidence in the case such as: medical history, medical signs and laboratory findings, the effects of treatment, reports of daily activities, lay evidence, recorded

observations, and medical source statements.") (citing SSR 96-8p, 1996 SSR LEXIS 5).

The Regulations provide:

> We may purchase a consultative examination to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim. Some examples of when we might purchase a consultative examination to secure needed medical evidence, such as clinical findings, laboratory tests, a diagnosis, or prognosis, include but are not limited to:
>
> > (1)  The additional evidence needed is not contained in the records of your medical sources;
> >
> > (2)  The evidence that may have been available from your treating or other medical sources cannot be obtained for reasons beyond your control, such as death or noncooperation of a medical source;
> >
> > (3)  Highly technical or specialized medical evidence that we need is not available from your treating or other medical sources; or
> >
> > (4)  There is an indication of a change in your condition that is likely to affect your ability to work, but the current severity of your impairment is not established.

20 CFR 404.1519a(b)(1)-(5) (2010).

In fulfilling the duty to conduct a full and fair inquiry, the ALJ has the discretion to order a consultative examination where the record establishes that such is necessary to enable the ALJ to render a decision. Holladay v. Bowen, 848 F.2d 1206, 1210 (11th Cir. 1988).  However, the ALJ is not required to

order an additional consultative examination where the record contains sufficient evidence to permit the ALJ's RFC determination. Good v. Astrue, 240 Fed. App'x 399, 404 (11th Cir. 2007) (unpublished) ("the ALJ need not order an additional consultative examination where the record was sufficient for a decision."); see also Ingram, 496 F.3d at 1269 ("The administrative law judge has a duty to develop the record where appropriate but is not required to order a consultative examination as long as the record contains sufficient evidence for the administrative law judge to make an informed decision.").

Having reviewed the record in its entirety, the Court finds that the ALJ fulfilled his duty to develop a full and fair record. The record before the ALJ contains the medical records from Plaintiff's orthopedic surgeons, Drs. Fontana and West, her chiropractor, her physical therapist, and additional doctors and nurses who treated Plaintiff for her back problems and other ailments, the consultative functional assessment by Dr. Sullivan, and Plaintiff's testimony at the administrative hearing. Although Dr. Sullivan did not examine Plaintiff, he had the benefit of records from her orthopedic surgeons, her chiropractor, her physical therapist, and her other treating doctors in preparing Plaintiff's functional physical assessment.

Upon a review of the medical evidence in this case, and Plaintiff's testimony, the ALJ determined that Plaintiff is capable of less than the full range of light work, with an added sit/stand option that would not require her to leave the workstation, as well as other limitations as set forth *supra*. (Tr. 35). In determining Plaintiff's RFC, the ALJ provided a thorough analysis of Plaintiff's medical history, including her treatment under both Drs. Fontana and West. This evidence was sufficient to enable the ALJ to determine Plaintiff's RFC. Indeed, there is nothing in the treatment notes of Plaintiff's treating physicians that indicates that Plaintiff's limitations exceed those in the RFC or that Plaintiff is unable to work. In fact, Plaintiff's treating physician who performed her back surgery, Dr. West, determined, nine weeks after her surgery, that Plaintiff was capable of significantly more strenuous work than the ALJ's determination of her RFC. (Id. at 241). Indeed, Dr. West opined that Plaintiff is able to perform "light/medium duty" with no heavy lifting, bending, or twisting. (Id.). Additionally, the record contains the results of a number of MRIs and X-rays, none of which demonstrate the existence of any significant problems after Plaintiff's back surgery in 2009. In fact, X-rays of Plaintiff's back on January 27, 2010 show no abnormalities at all. (Id. at 270-71).

Based on the evidence of record, the Court rejects Plaintiff's contention that the ALJ was required to obtain a consultative examination to determine the severity of her impairments because the ALJ clearly found that there was no change in Plaintiff's condition that was likely to affect her ability to work, and this determination was supported by substantial evidence. Three weeks after Plaintiff's surgery, Dr. West noted that Plaintiff had "decreased symptoms" and was "doing well" and "tolerating her daily routine". (Id. at 235). Six weeks after her surgery he noted "[m]arked improvement of her radicular symptoms" with "some residual anticipated lumbar complaints" and told her to "hold off from work for [two] weeks". (Id.)  Nine weeks after her surgery, he noted that she was "doing reasonably well regarding her lumbar spine" and after a complete physical assessment, he released her to return to work at light/medium duty with no heavy lifting, bending, or twisting. (Id. at 241). While Plaintiff claims that there was a change in her condition that required a consultative examination, this contention is belied by the record because over a year after her surgery, in January of 2010, x-rays taken at Mobile Infirmary revealed that her back was completely normal and she was instructed to rest for only two days, then return to work. (Id. at 269).

In addition, Plaintiff acknowledges that she is able to

drive her children to school, shop at the grocery store, perform light housework, watch television, sit outside, prepare "simple" meals, and attend social events, sporting events, and church services. (Id. at 64, 167, 169, 170). In light of the foregoing, the undersigned finds that the evidence before the ALJ was sufficient to allow her to render an informed decision. Thus, the ALJ was not required to order a consultative orthopedic examination, and accordingly, Plaintiff's claim that the ALJ failed to develop the record must fail.

### V.    Conclusion

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff's claim for a period of disability, disability insurance benefits, and supplemental security income be **AFFIRMED.**

**DONE** this **26th** day of **March, 2014.**

                    /s/ SONJA F. BIVINS
                    **UNITED STATES MAGISTRATE JUDGE**